IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JARED WRIGHT, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-15-3985 |
| SUNTRUST BANK, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiff Jared Wright ("Plaintiff" or "Wright") has brought this action against Defendant SunTrust Bank ("Defendant" or "SunTrust") alleging race discrimination (Count I) and sex discrimination (Count II) in connection with his termination from SunTrust, in violation of the Maryland Fair Employment Practices Act ("MFEPA"), MD. CODE ANN., STATE GOV'T § 20-606.[1]  *See* Compl., ¶¶ 31-42, ECF No. 2.  Currently pending before this Court is Defendant's Motion for Summary Judgment (ECF No. 23).  The parties' submissions have been reviewed, and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons stated herein, Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED.  Plaintiff has failed to establish a *prima facie* case of either race or sex discrimination.  Accordingly, Judgment shall be entered for Defendant SunTrust Bank as to

---

[1] This action was initially filed in the Circuit Court for Baltimore City, Maryland, but was subsequently removed to this Court, pursuant to 28 U.S.C. § 1441, *et seq.*  *See* Notice of Removal, ECF No. 1.  Diversity of citizenship exists between Plaintiff Wright, a resident of Catonsville, Maryland, and Defendant SunTrust, a Georgia corporation with its principal place of business in Atlanta, Georgia.  Decl. of Settle, ECF No. 1-1; Compl., ECF No. 2.  Additionally, the amount in controversy exceeds $75,000, as Plaintiff requests compensatory damages in the amount of $300,000 and punitive damages in the amount of $300,000.  *Id.*

both Counts I and II of the Complaint.  Even if Plaintiff had established a *prima facie* case of discrimination, Judgment would still be entered for SunTrust as to both counts because SunTrust has offered a "legitimate, non-discriminatory reason" for Plaintiff's termination, and Plaintiff has presented no evidence indicating that SunTrust's reason was pretextual.

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).  Plaintiff Jared Wright ("Plaintiff" or "Wright") is a Black male.  Wright Dep., p. 17, ECF Nos. 23-3, 32-12, & 33-1.  In April of 2013, Wright began working as a "Branch Manager III" at Defendant SunTrust Bank's ("Defendant" or "SunTrust") Crofton Safeway branch in Gambrills, Maryland, the highest ranking management position at that branch.  *Id.* at 49-50.  At all relevant times, Wright's supervisor was Ginger Siegel ("Siegel"), a White female.  *Id.* at 63-64.  Siegel was the Executive Vice President for SunTrust's Retail In-Store Division from March of 2013 through May of 2015.  Siegel Decl., ¶ 1, ECF No. 23-4. Siegel's office was located in SunTrust's Atlanta, Georgia headquarters.  *Id.* at 2.  Although Siegel and Wright communicated mostly via telephone, Wright has indicated that he did meet her in-person at a conference in Baltimore, Maryland.  Wright Dep., p. 64, ECF Nos. 23-3, 32-12, & 33-1.  Wright claims that Siegel gave him a "halfhearted handshake" when they met, looked at him in a way that "made [him] feel uncomfortable," and caused him to feel "as if she on some level hated [him]."  *Id.* at 65-66.  In contrast, Wright claims that Siegel was "warm and friendly" with other, Caucasian conference attendees.  *Id.* at 70.

2

SunTrust maintains a Code of Business Conduct and Ethics (the "Code") and an Equal Employment Opportunity Policy ("EEO Policy"), in which SunTrust pledges fair treatment to all employees and outlines its commitment to promoting equal employment opportunity and eliminating discrimination. *See* Schultz Decl., ¶¶ 6-8, Ex. B [Code], Ex. C [EEO Policy], ECF No. 23-2. The Code requires that SunTrust employees treat customers and fellow employees with dignity and respect. *Id.* All SunTrust employees are trained and tested on the Code annually and "are advised that they are responsible for knowing the contents of the Code and following it at all times." *Id.* ¶ 7. As a "Branch Manager III," Wright was required to have experience "[i]nteracting confidently with clients, in a professional manner with a high degree of service quality," while adhering to "applicable regulations, internal controls, policies, procedures, and the SunTrust Code of Conduct." *Id.* at Ex. A [Job Summaries]. Wright has indicated that he performed the duties of his position "in a satisfactory manner" at all relevant times. Compl., ¶ 9, ECF No. 2. Specifically, he claims that he received a bonus in October of 2013 "which is only awarded to employees in good standing."[2] *Id.* ¶ 10. Additionally, Wright claims that his "expertise" was used in a "special capacity" in October of 2013, when he was asked "to go to other branches to assist with whatever the branch needed." Wright Dep., p. 320, ECF Nos. 23-3, 32-12, & 33-1.

Erin Emery, a White female, was the Assistant Branch Manager at the Crofton Safeway branch when Wright began work in April of 2013. *Id.* at 87, 191. Additionally, Jarmar Harris, a Black male, was a Financial Services Consultant IV at that branch. *Id.* at 87-

---

[2] Wright has subsequently submitted a Declaration dated November 21, 2016 (ECF No. 32-14) and attached Paycheck Summary, indicating that he received a "performance-based bonus" on November 30, 2013. It is unclear if this is the same bonus referenced in the Complaint.

88. Sometime after Wright became branch manager, he hired Audria Pindell ("Pindell") as a bank teller. *Id.* at 107. Wright has described her as both a "multi-racial" and "Black" female. *Id.* at 107-108, 217. In early December of 2013, Pindell missed work for a vacation without obtaining permission from branch management. *Id.* at 110-112. When she returned, Wright prepared a "written corrective action" against her, dated December 11, 2013. *See id.* at 110-112; Written Corrective Action, ECF No. 24 [SEALED]. In addition to scheduling time off from work without management approval, Wright alleged that Pindell had erroneously blamed her failure to appear for work on the final day of her vacation on a flight cancellation. *Id.* As a result of the corrective action, Pindell was placed on probation. Wright informed Pindell of the written corrective action document he had prepared, but Pindell objected to Wright's allegations and refused to sign it. *Id.* at 115-123.

On December 12, 2013, Pindell contacted Lauren Schultz ("Schultz"), a member of "SunTrust Teammate Relations" to complain about the written corrective action. Schultz Decl., ¶ 11, ECF No. 23-2. Schultz informed Pindell of SunTrust's Employee Dispute Resolution ("EDR") procedure for appealing the corrective action, and on December 18, 2013, Pindell submitted her appeal papers. *Id.* at 11, 12-13. That same day, Pindell informed Schultz that Wright had refused to provide her with a copy of the corrective action document and had yelled at her loudly in front of clients to go home after she refused to email the combination to the branch's safe to a new employee, Steven Parsley ("Parsley"), who was starting that day. *Id.* ¶ 13, Ex. F [Email]. On December 19, 2013, Schultz contacted Wright regarding these allegations. *Id.* ¶ 14. Wright denied yelling at Pindell, although he did describe Pindell as "ranting." *Id.* ¶ 14, Ex. G [Wright Interview Notes].

Schultz instructed Wright that he was required to supply Pindell with a copy of the written corrective action.  *Id.*  Parsley, the new branch employee, also provided a statement on the incident.  He indicated that Pindell and Wright engaged in an "argument," although he "did not hear any of the argument."  *Id.* at Ex. H [Parsley Letter].

On the following day, December 20, 2013, Wright, Pindell, and Parsley were again working at the branch together.  Despite Schultz's instructions, Wright had still not given Pindell the corrective action document.  Wright Dep., p. 173, ECF Nos. 23-3, 32-12, & 33-1. Instead, Wright began collecting information for Pindell's appeal of that corrective action. *Id.* at 198-99.  At 2:58 p.m. Wright sent an email to Pindell asking for a "yes or no" answer as to whether Harris had approved her vacation absences on December 10th or 11th of that year.  Pindell responded "no" at 3:00 p.m.  *Id.* at 174-76.  According to Wright, he then gave Pindell the corrective action in a back room at the branch and instructed her to leave the premises.  *Id.* at 160.  Wright has indicated that Pindell did not leave, and he asked her a second time to exit the branch.  *Id.* at 161.  When Pindell still refused to leave, Wright instructed the police to escort Pindell from the branch.  *Id.* at 162-64.

After learning of the events of December 20, 2013, Schultz placed Pindell on administrative leave pending an investigation of the incident.  *Id.* ¶ 16.  Pindell supplied Schultz with a statement setting forth her account of the events of December 20th.  Pindell has indicated that Wright repeatedly demanded information from her for the corrective action proceedings and that, when they were both in the teller area at the front of the branch, he shouted at her to leave so forcefully that spit got in her hair.  Schultz Decl., ¶ 17, Ex. J [Pindell Email], ECF No. 23-2.  Pindell informed Schultz that Wright had yelled "shut

your mo[u]th" and "GET THE HELL OUT OF MY BRANCH," leaving Pindell feeling "shaken up." *Id.* Pindell claims that a client witnessing these events from the teller area said, "It is the holidays lighten up." *Id.* Schultz also spoke to Parsley, who corroborated Pindell's account. Parsley has indicated that he first heard Wright and Pindell yelling in the back room, after which time Pindell returned to her teller station. *Id.* ¶ 18, Ex. K [Parsley Statement]. Parsley confirmed that Wright "spit on [Pindell]," that they were "both yelling and screaming" and that "[a]round five clients" were present "during the yelling match." *Id.* He claims that when Pindell had not closed the cash drawer at her teller station, Wright approached her at a distance of one to two feet and told her that she needed to close her drawer. *Id.* Parsley has further indicated that one client at his teller window "kept staring at [me] saying 'Oh my God, Oh my God. We need to be happy here, it's the holidays." *Id.*

After investigating the December 20th incident, Schultz prepared a summary of her findings. *Id.* ¶ 20, Ex. M [Summary]. Schultz shared these findings with Siegel, who subsequently decided to terminate both Pindell and Wright's employment. *Id.* ¶ 21. Before Siegel informed Wright of her decision, she received additional correspondence from a branch client who had presumably witnessed the December 20th incident. The client expressed concerns about the management of the branch, specifically citing Wright's verbal altercation with an employee, who the client identified as "Audria(?)," in the client's presence. *Id.* ¶ 22, Ex. N [Client Email]; Siegel Decl., ¶ 9, ECF No. 23-4. The client commented that "Jared exhibited an utter lack of professionalism and poise." *Id.*

On January 13, 2014, Siegel called Wright to inform him that he was terminated from

SunTrust. Compl., ¶ 20, ECF No. 2. A confidential termination memo (ECF No. 23-4, Ex.

A) memorialized the reasons for Siegel's actions. That memo read as follows:

> On December 18th, teammate Audria Pindell requested a copy of her
> probation document which Jared refused to provide. All SunTrust teammates
> are entitled to copies of Corrective Action regardless if they signed the
> document or not. Later that day, Jared confronted Audria regarding a combo
> she was to email to another Teammate. This confrontation escalated to Jared
> yelling for a moment and then sending Audria home.
>
> December 20th, Jared continuously approached Audria throughout the day to
> provide dates to him in reference to her probation appeal. Jared stated that
> she was uncooperative each time and would often make negative remarks.
> Knowing the situation was escalating throughout the day, he confronted her
> one last time in the afternoon about the dates. This resulted in a yelling
> argument between Jared and Audria at the front of the in-store branch. This
> occurred in front of clients and teammates. Clients made comments of
> disbelief, and your actions resulted in damaging SunTrust reputation.
>
> As a result of Jared Wright violating SunTrust Code of Conduct, by not
> treating clients and teammates with dignity and respect, contribution violation
> of poor client service, poor managerial judgment, and leadership
> incompetence, I have made the decision to terminate his employment.

Seigel Decl., ¶ 11, Ex. A [Termination Memo], ECF No. 23-4.

Wright claims that he asked Siegel why she had never discussed this matter with him

prior to terminating his employment and that Siegel claimed human resources had told her

not to. Compl., ¶ 21, ECF No. 2. He also claims that no one at human resources would

return his calls or emails after that time. *Id.* ¶ 22. Wright objects that he was never given the

opportunity to defend himself or afforded "progressive discipline," pursuant to SunTrust's

internal policies. *Id.* ¶ 23; Charge of Discrimination, ECF No. 32-6. Wright contends that

he sent several appeals to three levels of upper human resources management, but that his

case was not heard.  *Id.* ¶ 24.  Specifically, Wright claims that he appealed his termination via letter, but that his appeal was denied on January 31, 2014, then again on February 14, 2014. *See* Letter of Appeal, ECF No. 32-7; Final Determination Letter, ECF No. 32-8.  Wright indicates that he was subsequently awarded unemployment benefits and that a claims benefit examiner determined "[i]nsufficient evidence ha[d] been presented to show any misconduct in connection with the work."  Notice of Benefit Determination, ECF No. 32-9.[3]

Wright objects that Assistant Branch Manager Emery, a Caucasian female, assumed his responsibilities following his termination.  Compl., ¶ 25, ECF No. 2.  He contends that Emery has been disciplined twice in the past for "flagrant misconduct," the most recent discipline being imposed in April of 2013.[4]  *Id.* ¶ 26.  Wright claims that when he became Branch Manager at the Crofton Safeway, Emery had already been given a final written warning for making a transaction for a family member in violation of the SunTrust Code of Conduct.  Wright Dep., p. 85-86, 246-247, ECF Nos. 23-3, 32-12, & 33-1.  Rather than being terminated, Wright objects that Emery was slated for promotion.  Compl., ¶¶ 27-28, ECF No. 2.  Wright has indicated that he was eventually replaced by James Howe and Steven Kugler, both of whom are White males.  *Id.* ¶ 29.

In February of 2014, Wright filed a complaint against SunTrust with the Maryland Commission on Civil Rights alleging race and sex discrimination in violation of MD. CODE ANN., STATE GOV'T § 20-606.  More than 180 days after the administrative charge was filed,

---

[3] Unemployment compensation findings are not determinative of facts in a discrimination case.  *Pettis v. House of Ruth Maryland*, 2006 WL 6507699, at * 1 (4th Cir. March 6, 2006) (unpublished, per curiam) (citing *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 360 (4th Cir. 1985), abrogated on other grounds by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

[4] SunTrust admits that Emery "was disciplined in April [of] 2013," but denies the alleged second disciplinary action.  Answer, ¶ 26, ECF No. 20.

and still within two years of his termination, Wright filed the instant Complaint in the Circuit Court for Baltimore City, Maryland.[5]   Compl., ¶¶ 1-2, ECF No. 2. This action was subsequently removed to this Court, pursuant to 28 U.S.C. §§ 1441, *et seq.*   *See* Notice of Removal, ECF No. 1.

<u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  In so doing, this Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern*

---

[5] A complainant alleging violations of the Maryland Fair Employment Practices Act by his employer or former employer may bring a civil action against that employer if (1) he timely filed a charge or complaint under federal, State, or local law alleging an unlawful employment practice; (2) at least 180 days have elapsed since the filing of the administrative charge or complaint; and (3) the civil action is filed within two years after the alleged unlawful employment practice occurred.  *See* MD. CODE ANN., STATE GOV'T § 20-1013.

*Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). As this Court has previously explained, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

<u>ANALYSIS</u>

Plaintiff Jared Wright's ("Plaintiff" or "Wright") two-count Complaint alleges both Race Discrimination (Count I) and Sex Discrimination (Count II), in violation of the Maryland Fair Employment Practices Act ("MFEPA"), MD. CODE ANN., STATE GOV'T § 20-606. *See* Compl., ¶¶ 31-42, ECF No. 2. In the pending Motion for Summary Judgment (ECF No. 23), Defendant SunTrust Bank ("Defendant" or "SunTrust") has moved for summary judgment on both counts.

In analyzing claims of race and sex discrimination under the Maryland Fair Employment Practices Act, courts consistently utilize the same framework applied to claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq. See, e.g., Finkle v. Howard Cty.*, 640 F. App'x 245, 248, n. 2 (4th Cir. 2016) ("Maryland courts apply the Title

10

VII frameworks to claims under the Fair Employment Practices Act.") (citing *Dobkin v. Univ. of Balt. Sch. of Law*, 63 A.3d 692, 699–701 (2013)).  Where, as here, the record contains no direct evidence of discrimination, a Title VII plaintiff's claims are analyzed under the burden-shifting scheme established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff must first make out a *prima facie* case of discrimination.  If a *prima facie* case is established, the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for its adverse employment action.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996).  If the employer fulfills this reciprocal duty, the burden reverts back to the plaintiff to establish that the defendant's proffered reason is pretextual and that his termination was instead motivated by his race or sex.  S*ee St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

I.    Plaintiff Has Failed to Establish a *Prima Facie* Case of Race or Sex Discrimination

An employee establishes a *prima facie* case of race or sex discrimination under Title VII by showing that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he was subjected to an adverse employment action; and (4) similarly situated employees outside of his class received more favorable treatment.  *See Holand v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *see also Prince–Garrison v. Md. Dep't of Health & Mental Hygiene*, 526 F. Supp. 2d 550, 554 (D. Md. 2007) (citing *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 573 (D. Md. 2000)).  "The central focus of the inquiry is whether the employer has treated 'some people less favorably than others because of their race, color, religion, sex or national origin.' "  *Foreman v. Weinstein*, 485 F. Supp. 2d 608, 612 (D. Md. 2007) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Plaintiff Wright has clearly satisfied the first prong of a *prima facie* case, membership in a "protected class."  The parties do not dispute that Wright is a member of a protected class, as he is a Black male.  *See, e.g., Middleton v. Frito-Lay, Inc.*, 68 F. Supp. 2d 665, 668 (D. Md. 1999) ("Clearly [Plaintiff] has established that he is a member of a protected class, as he is a black male.").  Likewise, there is no dispute that Plaintiff suffered an "adverse employment action," thus satisfying the third prong.  The record before this Court clearly indicates that Wright was terminated from his position as a SunTrust Bank "Branch Manager III" on January 13, 2014.  *See, e.g.*, Siegel Decl., Ex. A [Termination Memo], ECF No. 23-4. However, for the reasons discussed *infra*, Plaintiff has failed to satisfy the second and fourth prongs of a *prima facie* case of race or sex discrimination.

With respect to the second prong, "job performance," Wright contends that he was "performing satisfactorily during his ten (10) month tenure, because he was awarded both, a quarterly performance-based award, and a discretionary award by next level management for the 3rd quarter of 2013."  Pl. Opp'n, p. 11, ECF No. 32 (citing Paycheck Summary, ECF No. 32-14).  However, the record before this Court also indicates that Plaintiff engaged in a loud altercation with Audria Pindell, a fellow SunTrust employee and his subordinate, in front of SunTrust clients on December 20, 2013.  Plaintiff Wright concedes that he did argue with Pindell "in a straight tone" *in the teller area* on that day, instructing her to leave the premises.  Wright Dep., p. 160-61, ECF Nos. 23-3, 32-12, & 33-1.  Pindell later informed Lauren Schultz, a member of "SunTrust Teammate Relations," that Wright had yelled "shut your mo[u]th" and "GET THE HELL OUT OF MY BRANCH," causing spit to fly out of his mouth and onto Pindell's hair and leaving Pindell feeling "shaken up."  Schultz Decl., ¶

12

17, Ex. J [Pindell Email], ECF No. 23-2.  Steven Parsley, another employee present at the scene, confirmed that Wright "spit on [Pindell]," that they were "both yelling and screaming" and that "[a]round five clients" were present "during the yelling match."  *Id.* ¶ 18, Ex. K [Parsley Statement].  Furthermore, SunTrust Executive Vice President Ginger Siegel received an email from a SunTrust client after the incident specifically raising concerns about Wright's capabilities as a branch manager after he witnessed Wright "engage[ ] in a verbal altercation with a newer employee, Audria(?) right in front of [him]."  *Id.* ¶ 22, Ex. N [Client Email]; Siegel Decl., ¶ 9, ECF No. 23-4.  The bank client concluded that Wright "exhibited an utter lack of professionalism and poise."  *Id.*

Plaintiff concedes that it is " 'the perception of the decision maker' " that matters " 'in considering whether [an] employee was meeting job expectations at the time of dismissal.' "  Pl. Opp'n, p. 11, ECF No. 32 (quoting *Pettis v. Nottoway Cty. Sch. Bd.*, 980 F. Supp. 2d 717, 725 (E.D. Va. 2013), *aff'd*, 592 F. App'x 158 (4th Cir. 2014) (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).  All of the December 20, 2013 incident reports discussed *supra* were conveyed to Siegel prior to Wright's termination on January 13, 2014.  Additionally, Wright's actions were in clear violation of the SunTrust Code of Conduct, which requires employees to treat fellow employees with respect and to interact professionally with clients. *See* Schultz Decl., ¶¶ 6-8, Ex. B [Code].  For these reasons, Plaintiff has failed to demonstrate that he was meeting SunTrust's legitimate expectations at the time of his termination.

As to the fourth prong of a *prima facie* case, Plaintiff's treatment as compared to "similarly situated" employees outside his class, Plaintiff specifically alleges that Erin Emery, a White female and the Assistant Branch Manager at his branch, "was disciplined less harshly for more egregious violations of Defendant's policies." *Id.* at 10.   The United States Court of Appeals for the Fourth Circuit has held that where a plaintiff "base[s] [his] allegations completely upon a comparison to an employee from a non-protected class . . . the validity of [his] *prima facie* case depends upon whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citations omitted).   The plaintiff must "show that they are similar in all relevant respects to their comparator." *Id.*   "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Although Plaintiff and Emery both worked at the Crofton Safeway branch, Emery was a lower-ranked employee and engaged in different conduct than Plaintiff.   Wright was a Branch Manager III, while Emery was an Assistant Branch Manager.   Additionally, the record indicates that *different people* administered discipline for Wright's and Emery's respective violations of the SunTrust internal code.   Emery's violation of SunTrust's Code of Conduct occurred prior to Wright's working at the Crofton Safeway branch.   Wright was terminated by his superior, Executive Vice President Siegel.   In contrast, Wright's predecessor, the former branch manager, indicated to Wright when he started that "*she was*

14

placing Erin Emery on a corrective action, or *had just placed* Erin Emery on a corrective action." Wright Dep., p. 85, ECF No. 33-1.  Wright now contends that it is "reasonable to infer" that Siegel was also involved in Emery's discipline.  Pl. Opp'n, p. 12, ECF No. 23. However, Wright offers no evidence that Siegel was involved.  On the contrary, he stated at his deposition that he "[didn't] know the details of [Emery's discipline]."  Wright Dep., p. 247, ECF No. 33-1.  The Fourth Circuit has held that "[i]f different decision-makers are involved, employees are generally not similarly situated."  *Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007).  Pindell, the only other person who engaged in nearly identical conduct to Wright, was subject to the exact same consequence: termination. For these reasons, Wright has failed to establish a *prima facie* case of discrimination.

II.     A Legitimate, Non-Discriminatory Reason Has Been Offered

Because Plaintiff has failed to establish a *prima facie* case of either race or sex discrimination, Judgment shall be entered for Defendant SunTrust as to both Counts I and II of the Complaint.  Even if Plaintiff had established a *prima facie* case of race or sex discrimination, SunTrust would still be entitled to Judgment on both counts because SunTrust has offered a "legitimate, non-discriminatory reason" for Plaintiff's termination, and Plaintiff has presented no evidence suggesting that SunTrust's reason was pretextual.

The United States Court of Appeals for the Fourth Circuit has explained that "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.' " *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d

293, 299 (4th Cir. 1998)).   A Court should not second-guess an employer's appraisal. *Hawkins*, 203 F.3d at 280. Rather, the Court's sole concern should be "whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.* (quoting *DeJarnette*, 133 F.3d at 299). The Fourth Circuit has further announced that it does "not believe that Title VII authorizes courts to declare unlawful every arbitrary and unfair employment decision." *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994).

As discussed *supra*, SunTrust has indicated that Wright was terminated for engaging in a verbal altercation with Pindell, a fellow SunTrust employee, in front of SunTrust clients. Siegel specifically provided Wright with this explanation when she called to inform him of his termination.   Siegel based her decision on the results of an investigation conducted by Schultz, which included statements by all SunTrust employees present at the scene. Furthermore, a client of Wright's branch indicated to Siegel via email that he had witnessed the event and had serious doubts about Wright's management.   Wright's handling of the altercation with Pindell, which violated SunTrust's Code of Conduct, was specifically identified as the reason for his termination in an internal memo (ECF No. 23-4, Ex. A).

In an attempt to establish pretext, Plaintiff Wright has testified that Siegel treated him differently than other Caucasian and female attendees at a conference in Baltimore, Maryland, but cites only his personal feelings about her greeting, the manner in which she looked at him, and the style of her handshake as evidence of discriminatory motive. Additionally, Wright alleges that SunTrust fired another Black branch manager at a different branch in the same region "for an unwarranted, frivolous reason," although Wright admits that he does not know the details of that incident.   Wright Dep., p. 299-301, ECF Nos. 23-3,

32-12, & 33-1.   Such self-serving assertions are insufficient to establish that a proffered legitimate, non-discriminatory reason is pretext for discrimination. *See Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 732 (4th Cir. 1996) (in evaluating whether plaintiff has adduced a sufficient quantity of proof, the court may consider the relative strength of the employer's asserted nondiscriminatory reasons); *Evans v. Tech. App. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (unsubstantiated allegations and bald assertions will not carry the day for employee); *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) (naked opinions and conclusory allegations insufficient to withstand summary judgment).   If the plaintiff cannot present facts that would permit a reasonable inference that the stated reason is a pretext for discrimination, summary judgment in favor of the defendant should be granted. *See Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47 (2000)).

<u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED.  Plaintiff has failed to establish a *prima facie* case of either race or sex discrimination.  Accordingly, JUDGMENT shall be ENTERED for Defendant SunTrust Bank as to both Counts I and II of the Complaint.  Even if Plaintiff had established a *prima facie* case of discrimination, Judgment would still be entered for SunTrust as to both counts because SunTrust has offered a "legitimate, non-discriminatory reason" for Plaintiff's termination, and Plaintiff has presented no evidence indicating that SunTrust's reason was pretextual.

A separate Order follows.

Dated: February 16, 2017                                        _____/s/_____
                                                                                  Richard D. Bennett
                                                                                  United States District Judge

18